699 So.2d 729 (1997)
Brent C. MILLER, et al., Appellants,
v.
JACOBS & GOODMAN, P.A., Appellee.
No. 96-480.
District Court of Appeal of Florida, Fifth District.
July 25, 1997.
*730 Marcia K. Lippincott, P.A., Maitland, for Appellants.
Michael R. Levin and Christopher T. Hill of Rumberger, Kirk & Caldwell, A Professional Association, Orlando, for Appellee.
PETERSON, Judge.
Brent Miller, Charles Rand, and Miller & Rand, P.A., ("M & R"), appeal the trial court's allocation of attorney's fees earned from clients that were initially represented by Miller and Rand when they were associates with appellee law firm, Jacobs & Goodman, P.A., ("J & G"), and who subsequently chose to continue with M & R. The trial court based its allocation of attorney's fees on the terms of the parties' employment agreements. M & R contest the validity of those employment agreements with J & G and the preliminary and permanent injunctions granted thereunder. Alternatively, M & R argues J & G failed to establish any breach of contract. M & R further contests the award of attorney's fees.

FACTUAL BACKGROUND
J & G is a plaintiff's personal injury law firm representing clients for a contingency fee. Brent Miller and Charles Rand are lawyers that were employed by J & G under identical written employment agreements that were re-executed annually. The agreements governed financial aspects of associates' active and post employment relationships with the firm. The much-contested agreements provide that an associate will not solicit clients upon departing the firm, and provide for a procedure to notify clients of the departure. If a client follows a departing associate, J & G is to receive 75% of the fees earned from that client. Fees and costs earned from these cases are to be deposited into an interest bearing account subject to withdrawal only upon the written consent of both parties. The agreements also provide for the possibility of injunctive relief being used to enforce its terms, and for reimbursement of attorney's fees expended on enforcement.
Miller's and Rand's last annual agreements were scheduled to expire on June 30, 1992 and August 31, 1992, respectively. On June 23, 1992, however, Miller's and Rand's employment with J & G terminated. J & G alleged that, for approximately one month before their departure, M & R engaged in a variety of activities to establish their own *731 personal injury law firm. During this period prior to their termination, M & R allegedly solicited J & G clients without J & G's knowledge. J & G further alleged that at a meeting held with M & R on June 23, 1992, the latter informed the former that they would not comply with the fee apportionment provision of their contracts, based upon their view that such provision was unenforceable and unethical in light of a then-recent Ninth Circuit Court decision, Ohio Casualty Company v. Jacobs & Goodman, et. al., Case No. CI 92-11963.
J & G first instituted this action for injunctive relief against M & R to require all fees and costs earned on cases in which the clients followed M & R to be held by the court and distributed pursuant to the terms of the parties' employment agreement. Following a hearing on J & G's request for an injunction, an order granting preliminary injunction was entered. This order provided the funds must be placed in a separate federally insured bank account.
In July of 1993, M & R unsuccessfully moved to dissolve the preliminary injunction which was denied. M & R appealed the denial and this court affirmed on procedural grounds. Miller v. Jacobs & Goodman, P.A., 639 So.2d 1088 (Fla. 5th DCA 1994). The trial court next entered a partial summary judgment in favor of J & G in March, 1995 finding the parties' employment agreement to be valid and enforceable, and striking all of M & R's affirmative defenses to the contrary. Accordingly, the trial court ruled that the only issue to be decided at trial was whether the defendants breached their agreement, and the amount of damages incurred.
For purposes of trial, the parties divided the cases in dispute into three categories. Category I cases were defined as those in which clients that were represented by Miller or Rand as employees of J & G on June 23, 1992, continued to be represented by M & R after termination. M & R conceded that these clients fell within the scope of the employment contract. Category II cases were cases which M & R contended fell outside the scope of the agreement because these clients initially chose continued representation by J & G, and only later, after becoming dissatisfied, retained M & R. Category III cases involved clients who left J & G and followed M & R but for whom no fee had yet been generated.
The trial court found that the evidence established an anticipatory and material breach of the parties' agreement by M & R. The trial court determined that as to Category I and II clients, J & G was entitled to 75% of the fees generated by those cases. The trial court further found that a case referred to as the Lambertson case did not fall within the scope of the parties' employment agreement. Nevertheless, on its own initiative, the trial court granted J & G a quantum meruit award for the Lambertson case in the amount of $99,990. As to Category III cases, the trial court ordered that any future sums earned as fees should be deposited in the checking account established by the preliminary injunction, with no monies to be distributed without order of court or written stipulation of the parties. Additionally, the trial court assessed attorney's fees against M & R in the amount of $235,000. This appeal followed the denial of M & R's motions for new trial and rehearing.

VALIDITY OF EMPLOYMENT AGREEMENT
M & R argues that the parties' employment agreement is unenforceable because it violates public policy and because it places an economic burden upon a client's freedom to choose legal representation. M & R's rationale seems to be that while "financial disincentive provisions," like J & G's 75%/25% split provision for their departing associates, are intended to protect the employing firm from serious financial detriment resulting from the loss of clients and goodwill, these provisions have the effect of restricting the practice of law and thereby limit a client's choice of counsel. In other words, by forcing lawyers to choose between compensation and continued service to their clients, financial disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer client relationship, and more importantly, with clients' free choice of counsel. Thus, the economic consequence *732 restricts the practice of law and ultimately harms clients that must be turned away.
With the exception of the circuit court decision in Ohio Casualty Co. v. Jacobs & Goodman, et. al., Case No. CI 92-11963, however, no opinion in this state appears to exist which finds that post termination client fee allocation provisions are unenforceable as against public policy. To the contrary, Florida courts' are uniform in enforcing such fee splitting arrangements between lawyers and law firms. See Hessen v. Kaplan, 564 So.2d 184, 185 (Fla. 3d DCA 1990) (case involved one law firm that divided into two, court interpreted and ratified payment of the 40%/60% fee recovery formula). Several Florida decisions have held that Florida Rules of Professional Conduct such as Rule 4-5.6 (which prohibits attorneys from making agreements restricting the right to practice law following the termination of an employment relationship) or Rule 4-1.5 (which prohibits attorneys from entering into an agreement to collect excessive fees) may not be used to invalidate or render void fee splitting agreements. See Harvard Farms, Inc. v. National Cas. Co., 617 So.2d 400 (Fla. 3d DCA 1993) (quoting preamble to Rules of Professional Conduct, court notes that the rules only create an ethical responsibility in attorneys); Lee v. Florida Dep't of Ins. and Treasurer, 586 So.2d 1185 (Fla. 1st DCA 1991)(Rule 4-5.6 may not be used to invalidate, or as a defense to, a private contract action); Mary J. Kaufman, P.A. v. Davis & Meadows, P.A., 600 So.2d 1208 (Fla. 1st DCA 1992)(attorney cannot rely upon ethical Rule 4-1.5 to avoid his contractual obligations pursuant to fee-splitting agreement). See also Professional Ethics of the Florida Bar, Opinions 94-1 and 84-1 (specifically state that the fee splitting arrangement between a departing associate and a law firm, in the event a client of the firm elects to hire the associate, is not an ethics issue but instead is a matter of contract to be decided between the associate and the firm); Informal Opinion No. 870 (1965) of the ABA committee on Professional Ethics (states an attorney should not interpose as a reason for not carrying out the agreement the attorney made that the agreement was not ethical because the matter of ethics should have been recognized and adhered to by the attorneys before they entered into the agreement).
Accordingly, we reject M & R's argument that the fee splitting agreement that they entered into with J & G is void as against public policy. We observe that the client originally contracted with J & G for representation, and that representation can be terminated at any time by the client. If that client chooses to have M & R represent him or her, M & R must simply make the decision whether to accept representation after considering such factors as the economics of representation, the effort required to bring the matter to a close, potential conflicts, inclination or competency to represent in that particular matter, or an infinite number of other factors that exist whenever an attorney is asked to accept representation. Some of these factors may preclude an individual from obtaining counsel of choice and the amount of compensation that an attorney may expect to realize from a particular engagement may be one of those factors.
In sum, we hold lawyers are free to enter into agreements which provide for post termination allocation of client fees. We reject M & R's argument that such agreements are unenforceable as against public policy because they place an undue economic burden on a client's freedom to choose legal representation. In the instant parties' employment agreement, however, we find the liquidation clause to be unenforceable and invalid due to its failure to adequately measure damages. The liquidation clause, found in paragraph 10 of the parties' agreement, states:
Employee agrees that in the event of a breach of any term of this Agreement, the Firm shall be entitled to receive these liquidated damages and also receive additional damages arising from such breach.
* * * * * *
Should a client of this Firm choose to have Employee or an entity by which Employee is later employed or any other entity or person to whom Employee has referred such client continue such client's personal representation following the Term of This *733 Agreement, Employee agrees to: (A) reimburse this Firm its outstanding expenses incurred to date on behalf of each such client immediately upon the termination of this Agreement or immediately upon Firm being terminated by such client, whichever occurs earlier; and (B) pay this Firm an amount equal to the greater of:
I. seventy-five percent (75%) of the fee that this Firm would have earned if it had remained employed by each such client at the time of each monetary recovery made for the benefit of each such client by Employee or an entity later employing Employee or any other entity or person to whom Employee has referred such client; or
ii. seventy-five percent (75%) of the sum of any attorney's fee actually received and earned with respect to each such client by Employee and/or an entity later employing Employee and/or any other such person or entity to whom Employee has referred such client.
In Lefemine v. Baron, 573 So.2d 326 (Fla. 1991), the supreme court invalidated a liquidated damage clause within a real estate contract that permitted the seller to choose between retaining a prepaid security deposit or bringing an action for actual damages. In doing so, the Lefemine court opined as follows:
The reason why the forfeiture clause must fail in this case is that the option granted to Baron either to choose liquidated damages or to sue for actual damages indicates an intent to penalize the defaulting buyer and rejects the intent to liquidate damages in the event of a breach. The buyer under a liquidated damages provision with such an option is always at risk for damages greater than the liquidated sum. On the other hand, if the actual damages are less than the liquidated sum, the buyer is nevertheless obligated by the liquidated damages clause because the Seller will take the deposit under the clause. Because neither party intends the stipulated sum to be the agreed-upon measure of damages, the provision cannot be a valid liquidated damages clause.
Id. at 329-330. Paragraph 10 is not a liquidated damages clause because the provision that J & G "shall be entitled to receive these liquidated damages and also receive additional damages arising from such breach," (emphasis added) does not limit damages to 75% of the higher of the two possible amounts. J & G argues that this portion of the agreement is not fatal to the liquidated damages provision because the additional damages refers to other provisions of the agreement relating to compensation paid to, and expenses paid in behalf of, the withdrawing attorney. That argument is flawed: the liquidated damages clause specifically relates to "a breach of any term of this Agreement." (emphasis added). We also note that under the first subparagraph, "75% of the fee that [J & G] would have earned if it had remained employed by each such client ...," is not a liquidated amount as it is unknown how much or little that client would have paid J & G had he or she remained with J & G. Finally, we observe that J & G itself, in its prayer for damages in Counts I and II of its amended complaint, asks for damages "not limited to seventy-five percent (75%) of all attorneys fees earned by Defendant Miller, Miller and Rand, P.A.,...."
Because the stipulated formula was not an agreed-upon sole remedy and J & G was free to pursue additional damages, the provision cannot be upheld as a valid liquidated damages clause. The trial court granted summary judgment on the entire employment agreement thereby setting the stage for a trial on damages based upon the liquidated damages provision of Paragraph 10. We vacate the trial court's summary judgment in part by finding that the liquidated damages portion of Paragraph 10 is unenforceable and remand for further proceedings as to Category I and II clients.[1]

ANTICIPATORY AND MATERIAL BREACH OF THE PARTIES' EMPLOYMENT AGREEMENT
J & G claim that the trial court properly found an anticipatory breach by virtue of *734 the statements made by Miller and Rand to Jacobs during their June 23, 1992 meeting. On that date, Miller and Rand gave Jacobs their two weeks notice. According to Jacobs, Miller and Rand unequivocally informed him that they would not abide by their employment agreement. Contrarily, Miller and Rand testified that they did not announce a refusal to abide by the terms of the contract; rather, in light of the decision in Ohio Casualty which found the same agreement unethical and unenforceable, they stated they would not do anything unethical and would abide by the decision of the Fifth District Court of Appeal in the anticipated appeal of Ohio Casualty.[2] We find it was within the trial court's discretion to credit Jacobs' testimony over that of Miller and Rand's and to find that an anticipatory breach took place.
Regardless, material breaches by M & R surfaced when the following occurred in contravention of express terms of the parties' contract: After Miller and Rand were unable to gain cooperation on the part of J & G to send out a joint letter to clients notifying them of Miller and Rand's departure, Miller and Rand then began making telephone calls to certain clients without waiting five business days as required by the agreement. M & R then sent certain clients packages that contained a form letter to terminate J & G services, a statement of client's rights, and an authority to represent which is beyond what the agreement allowed, i.e., the agreement only allowed Miller and Rand to send a letter notifying clients of their departure. Finally, M & R did not reimburse J & G their costs upon the clients' immediate termination of J & G and continuance with M & R.
In sum, the above described action of Miller and Rand support the trial court's finding that they breached their employment agreement with J & G.

PRELIMINARY AND PERMANENT INJUNCTIONS
Miller and Rand left J & G on June 23, 1992. One week later, J & G filed suit and were successful in obtaining a preliminary mandatory injunction by July 2, 1992. This injunction required M & R to place all monies paid on cases for clients who had left J & G and continued to be represented by M & R in a special bank account controlled by court order. We conclude that there was no harm in this procedure since M & R were ethically bound to place the funds in a trust account pending determination of those persons entitled to the funds. In other words, J & G had an interest in the funds for costs advanced and fees. The extent of that interest was not yet determined and the collected funds were required to be placed in an M & R trust account until the interests were agreed upon and judicially determined. Rule Regulating Florida Bar 5-1.1. Thus, if error existed, it was harmless.

THE $99,996 QUANTUM MERUIT AWARD
Ann Lambertson was involved in a car accident in Colorado. After returning home to Florida she viewed J & G's television advertisement and retained its services. J & G assigned Rand to her case. Lambertson stated that she remained with J & G after Rand's departure because employees at J & G told her that Rand "had not gone to trial but twice, and he lost both cases; and that Rand did not care about her case, because he had left and did not notify her while he had notified others." Following Rand's departure, she became dissatisfied with J & G and terminated their representation. She then retained the services of a Tampa attorney who was not associated with any of the litigants. She subsequently became dissatisfied with her Tampa attorney's services and ultimately retained Rand, whom she located on her own. Lambertson's case later settled through the efforts of Rand and a Colorado attorney obtained through J & G.
The trial court divided the fee obtained by Rand by awarding J & G the quantum meruit sum of $99,996. The trial court arrived at this sum by allotting a 20% "origination fee" to J & G and equally dividing the remainder of the fee after concluding that the two firms provided almost equal service.
*735 Foremost, it should be noted that J & G never pled a quantum meruit theory. However, M & R impliedly consented to the case being tried on that theory and the parties apparently agree on appeal that J & G, as the firm that was discharged from a contingency fee contract with Lambertson, is entitled to a quantum meruit recovery determined by considering the totality of circumstances surrounding the professional relationship. Rosenberg v. Levin, 409 So.2d 1016 (Fla.1982); Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz, 652 So.2d 366 (Fla.1995). M & R does not agree, however, that an "origination fee" should be considered in this case because it was not requested in the pleadings and no evidence was presented justifying such an award. We agree with M & R that J & G failed to present any evidence that would justify an award of an "origination fee." Otherwise, the trial court's equal division of the fee based upon its belief that the parties provided equal service was within the court's discretion.

ATTORNEYS FEES AWARD
We vacate the award of attorney's fees because we have found that the liquidated damages portion of the employment agreement is invalid. The trial court may reconsider the award of attorney's fees at the conclusion of the matter.
In summary, we:
(1) Affirm the trial court's award of summary judgment to J & G on all issues except the validity of that portion of Paragraph 10 of the employment agreement that purports to provide for liquidated damages;
(2) Vacate the quantum meruit award on the Lambertson case with instructions to recalculate the division of fees without considering an award for an origination fee because it was neither pled nor proved;
(3) Vacate the award of all damages and attorney's fees;
(4) Remand for further proceedings.
GOSHORN and HARRIS, JJ., concur.
NOTES
[1] In doing so, we do not disturb the trial court's finding that Category II clients continued to be represented by M & R within the meaning of the parties' employment agreement.
[2] Ohio Casualty, however, was never appealed by J & G.