# CIRCUIT COURT OF THE CITY OF RICHMOND

Marks & Harrison

v.

Ruth E. Nathanson

April 7, 1999

Case Nos. LE-2441-4 and HJ-1887-1

BY JUDGE MELVIN R. HUGHES, JR.

In these cases, one at law seeking a money judgment and the other in equity seeking declaratory relief, the defendant has filed demurrers. Both cases involve common facts concerning the rights and obligations of the parties, an attorney, Nathanson, who was formerly employed with plaintiff, and a law firm, under a written employment contract. The facts that give rise to the parties' differences will be set out hereafter. On demurrer, the facts alleged are accepted as true. *Adkins v. Dixon*, 253 Va. 275 (1997); *Cox Cable Hampton Roads v. City of Norfolk*, 242 Va. 394 (1991). In deciding a demurrer, the court is "confined to the legal sufficiency of a pleading ... ." *Hop In Food Stores, Inc. v. Serve-N-Save, Inc.*, 237 Va. 206 (1989), citing *Bellamy v. Gates and Gill*, 214 Va. 314, 315-16 (1973).

Plaintiff advertises as a law firm engaged in personal injury practice. Nathanson was employed by the law firm as an attorney to provide legal services to clients of the firm. The parties entered into a written employment agreement which provided *inter alia* that, in the event Nathanson's employment with the firm ceased for any reason and Nathanson retained any

clients of the firm, she would promptly refund to the firm any costs advanced by the firm on behalf of any such clients and pay a portion of any contingent fees collected. On July 31, 1998, Nathanson resigned her employment and a total of 65 former clients of the firm elected to be represented by her. The firm alleges that Nathanson owes it $7,710.09 for costs advanced to the clients. With respect to costs, which is the subject of the law action, the demurrer is based on the argument that the costs provision is unenforceable because it violates D.R. 2-105, D.R. 2-106, and D.R. 5-103 and is contrary to the public policy of Virginia.

In its pertinent part D.R. 2-106 states:

> (A) A lawyer shall not be a party to a partnership or employment agreement that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits.

Nathanson argues that the contract provision restricts the ability of the client to make an informed and free choice of counsel and exacts a financial penalty. She further argues that it interposes serious financial burdens and effectively impairs her ability to practice law and earn a living.

The agreement contains a provision dealing with other aspects of the parties' relations when an attorney leaves the firm's employment. The contract provides:

> As provided in paragraph 9 hereof, all legal services rendered by Employee during the term of this agreement shall be rendered on behalf of Employer, and Employer shall be entitled to all fees or income derived from such services.... In the event that any of the clients taken by Employee are clients which had been retained by Employer on a contingency fee basis and such contingency fee case is pending as of the date on which Employee ceases to be employed by Employer, ("Cessation date"), Employee shall remit to Employer a portion of the total contingency fee collected upon a final determination of the case whether such fee is collected by the Employee or any future employer of Employee, to be determined in the following manner. In the event that a Final determination on a contingency fee case is made within a six (6) month period (the "First Recovery Period") immediately following the Cessation date Employee shall remit to Employer an amount equal to eighty percent

(80%) of the total fees recovered in connection with such case. If a final determination on a contingency fee case is made within the six (6) month period following the First recovery Period, Employee shall remit to Employer an amount equal to sixty-five percent (65%) of the total fees recovered in connection with such case. If a final determination on a contingency fee case is made anytime after the twelve (12) month period immediately following the Cessation Date, Employee shall refund to Employer an amount equal to fifty percent (50%) of the total fees recovered in connection with such case. All such payments shall be made promptly by Employee, but in no case later than five (5) days after receipt by Employee or any new Employer of Employee of the fees from the client or other third party payor.... In the event Employee wrongfully fails to remit to Employer as set forth above, Employer shall be entitled to recover from Employee any reasonable attorney's fees or other costs incurred by Employer in connection with the collection of such amounts.

Nathanson argues that the foregoing provision constitutes fee splitting which is forbidden under the same disciplinary rules.

### Costs

The court finds that the contract provision does not violate the ethical rules. Counsel has not presented, nor has the court found any Virginia authority on point concerning the issue. The court therefore will look to other jurisdictions in cases involving similar provisions.

In *Warner v. Carmini*, 678 So. 2d 561 (1996), the court addressed the issue of a cost reimbursement provision under a rule in Louisiana similar to Virginia's D.R. 2-106. In that case, the contract called for the attorney who was leaving the firm and was continuing to represent any of the firm's clients to reimburse the law firm in full within ten days for any out of pocket money advanced to or on behalf of the client. The departing attorney argued that the provision would impose severe financial penalties and restrict his practice of law. The Louisiana court held that the contract did not violate the rule and did not penalize the attorney: "It only requires that he bear the financial responsibility associated with handling the files he takes from the law firm." *Warner*, 678 So. 2d at 565.

> If any financial consequence to an attorney is enough to render all agreements with the law firm that he worked with null as against public policy, then that would mean that lawyers could not enter into valid agreements amongst themselves regarding the business aspects of the practice of law.... A party asserting public policy as a defense to the contract has the burden of clearly establishing that there is a well accepted and clearly defined public policy that makes the contract terms unenforceable.

*Warner*, 678 So. 2d at 564. The reimbursement provision simply shifts the burden of financing the case to the client's new attorney. The potential costs involved and the ability of the client to carry them are considerations any attorney must make in determining whether or not to take a case.

Nathanson argues that *Warner* is not applicable here since the court explicitly distinguishes its decision from a previous holding in *Minge v. Weeks*, 629 So. 2d 545 (1993). In *Minge*, the Louisiana court found that an employment agreement was unenforceable because it required the attorney to give his former employer 80% of any fees generated by cases the employee took with him and to reimburse the firm for any advanced costs. Nathanson argues that since her employment contract has provisions for both costs and for a percentage from any settlements or judgments of former clients, the holding of *Minge* should apply and the contract should be declared unenforceable. The analysis in *Minge*, however, was based on the percentage requirement not the reimbursement of costs. The only issue before the court on the demurrer in the law case is the reimbursement of costs provision. The percentage of fees issue will be discussed *infra*.

Nathanson further argues that the provision violates D.R. 2-105 and D.R. 5-103. These provisions deal with the requirements for contingency fee arrangements, the division of fees, and a lawyer's ability to advance the costs of litigation to a client. The court finds that these sections are not applicable to this case, where the issue is costs reimbursement.

Nathanson's final argument is that the employment contract does not provide for attorney's fees in an action for collection of costs. In this respect, the court finds that a resolution of this issue may turn on the interpretation of language in the contract which may be ambiguous. Thus, this issue will be left for later resolution during the proceedings.

The court finds, therefore, that the cost advance provision does not constitute an unethical restriction on Nathanson's ability to practice law and

does not otherwise violate the Virginia Code of Professional Responsibility. The demurrer in the law action is, therefore, overruled.

*Fees*

In the declaratory relief suit, Nathanson asserts that the fee percentage provision set out previously constitutes fee splitting in violation of D.R. 2-105(D) and D.R. 2-106(A). In their relevant parts these rules provide:

D.R. 2-105(D). A division of fees between lawyers who are not in the same firm may be made only if:
(1) the client consents to the employment of additional counsel;
(2) Both attorneys expressly assume responsibility to the client; and
(3) The terms of the division of the fee are disclosed to the client and the client consents thereto.

D.R. 2-106(A). A lawyer shall not be a party to a partnership or employment agreement that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits.

L.E.Op. 1556 addresses both rules as they apply to an employment contract between lawyers and firms. While the opinion, however, does not address a contract similar to the one at issue, it is instructive on how questions should be resolved in this dispute. In addressing fee splitting with a former firm, the opinion holds:

A lawyer who withdraws from a firm to compete with it and takes clients of the firm with him cannot be contractually obligated to divide his post-withdrawal fees from those clients with the firm.... Clients electing to go with a lawyer withdrawing from a firm are no longer clients of the firm. The firm no longer renders legal services to them. The withdrawn lawyer alone renders legal services and in turn earns the fee. Hence D.R. 2-105(D)'s conditions precedent to a division of fees between the firm and the withdrawing lawyer cannot be satisfied.

The situation here is not one where the law firm did no work on the cases and now wants a percentage of the fees. Rather, the court finds, the intent is to

recover for work done while the cases were with the firm. As noted, all 65 clients had initially retained the firm on a contingent fee basis. Thus, based on the arrangement, the firm has not received any payment for the work done prior to Nathanson leaving. The contractual agreement, however, is between the firm and the withdrawing lawyer, both of whom worked on the cases. Thus, Nathanson's argument that the contract is fee splitting unduly restricting her right to practice law and her clients' right to have the lawyer of their choosing is incorrect. The demurrer will be overruled for this and the reasons that follow.

A more analogous situation to the case at bar is that of payment for unbilled work and work in progress. L.E.Op. 1556 addresses this issue from the standpoint of the withdrawing lawyer's right to payment of fees for unbilled work and work in progress at the time the lawyer withdraws. The analysis, however, is also applicable to situations where the law firm is entitled to compensation for unbilled work. The opinion further provides:

> D.R. 2-105(D) speaks to a division of fees between lawyers who are not in the same firm. Though a lawyer who has withdrawn is no longer in the firm, his unbilled work and work in progress existing at the time of withdrawal were produced while he was with the firm. The fees attributable to such work though received by the firm after his withdrawal had been earned for services rendered as a member of the firm before his withdrawal. Under those circumstances neither the letter nor the spirit of D.R. 2-105(D) is violated … .

The same reasoning applies where the law firm is being paid for services it rendered prior to the lawyer's withdrawal. Here, all the cases were taken by Nathanson after the clients had retained Marks & Harrison. The firm is entitled to compensation for its services. This does not violate D.R. 2-105 since the fee is for work that the law firm did on the case while Nathanson was still employed by the firm. Just as Nathanson would be entitled to receive compensation for work that she provided to the firm prior to her withdrawal, the firm is also entitled to be compensated for its work. If the cases were billed on an hourly fee basis, the firm would be entitled to such billing while Nathanson was an employee. The same is true where the case is taken on a contingency fee basis; the firm is entitled to be compensated for the work done while the cases were there.

The second question is whether the contract violates D.R. 2-106 as an undue restriction on Nathanson's right to practice law. L.E.Op. 1556 adopts

the language of the New York Court of Appeals in addressing the interpretation of D.R. 2-105, stating:

> Restrictions on the practice of law, which include "financial disincentives" against competition as well as outright prohibitions, are objectionable primarily because they interfere with the client's choice of counsel; a clause that penalizes a competing attorney by requiring forfeiture of income could "functionally and realistically discourage" a withdrawing partner from serving clients who might wish to be represented by that lawyer.

Nathanson has cited ethics opinions and cases from numerous other jurisdictions for this principle. As with the cost issue, there are no Virginia cases on point. The court, therefore, must look to other jurisdictions for guidance. Nathanson cites an Ohio and a Colorado case as authority that percentage fees constitutes fee splitting. The court finds these authorities inapposite.

In *Supreme Court of Ohio Board of Commissioners on Grievances and Discipline*, Op. 91-3 (1991), the employment contract provided that when an associate left the firm, the client's files would be interim billed. If the client then went with the departing attorney, the attorney was required to make payments to the firm for portions of the fees generated for the next two years from that client. In *People v. Wilson*, 953 P.2d 1292 (Colo. 1998), the contract stated that, in the event that any client of the firm retained the departing attorney, the associate would compensate the firm in the amount of 75% of the total fee generated from the ultimate settlement or disposition of the case and for hours put in by the firm at the agreed hourly rate. In the case where the client was solicited by the departing attorney, the firm was entitled to 100% of the fee.

In both cases, the contracts entitled the law firms to full compensation for their services by charging an hourly rate for the services the firm provided. In the *Ohio* case, it appears that the firm worked on an hourly fee schedule. Before the file was turned over to the departing attorney, the firm billed the client and was compensated for the work performed. In *Wilson*, the law firm was also compensated at an hourly rate for its work. The percentages were not an effort to compensate the firms for work performed; it was in addition to other compensation. *Ohio* also provided that the firm receive a percentage of *any* fees that were generated from the client for a period of two years regardless of whether or not the firm ever worked on the case. In both cases,

the agreements were found to violate the Rules of Professional Responsibility. The percentages restricted the lawyer's right to practice law and the client's right to chose a lawyer.

Nathanson also cites a Michigan opinion arguing that the percentages restrict her right to practice law. In *State Bar of Michigan Standing Committee on Professional and Judicial Ethics*, Op. RI-245 (1995), the agreement was found to restrict the lawyer's right to practice. In that case, the agreement provided that a departing attorney would have to pay the firm one-third of all fees billed and collected for four years after the lawyer's departure. The committee concluded that the provision was unethical, noting that it required the lawyer to pay the former law firm one-third even though the law firm had not performed any of the work. Under the agreement, if the law firm represented a client in a personal injury case and the client later went with a departing attorney, the law firm was entitled to receive one third of any fees generated from that case or any unrelated case in the future. This is fee splitting and is clearly unethical.

In the case at bar, the percentage apply only to cases where the clients retained the firm on a contingent fee basis and then left to go with Nathanson prior to the conclusion of their cases. All the cases are cases which the firm was involved in and worked on. It was not compensated on an hourly basis for its work prior to Nathanson's departure; nor does the agreement require that the firm receive a percentage of fees for cases in which it had no involvement.

A case more like the one here, cited by the law firm, supports the validity of this contract provision. In *McCroskey, Feldman v. Waters*, 494 N.W.2d 826 (Mich. App. 1992), the court found that an employment contract similar to the one between Marks & Harrison and Nathanson was not unethical. The court approved an agreement which provided for a percentage ranging from 25% to 75% depending on the amount of the recovery for cases that were pending trial or awaiting filing when the lawyer left the firm. The firm testified that the primary purpose of the agreement was "to avoid the tedious and overwhelming task of having to divide the fee for each individual file on a quantum meruit basis." *McCroskey*, 494 N.W.2d at 827. It conceded that the percentages could have been more "detailed and specific" but that they were "fairly reflective of the firm's contribution to any given file." *Id*. at 827, 828. Similar to Nathanson, the defendant in *McCroskey* also argued that the agreement was illegal fee splitting and that the provisions were so overreaching as to amount to an actual restriction of the defendant's right to practice law. The court found that argument unpersuasive and held that the agreement was enforceable.

The agreement is simply a mechanism for dividing an already existing fee ... the contract simply seeks to obviate time consuming squabbles that formerly arose when plaintiff's entitlement to its fair share of any fee generated by a departing client's file was determined on a quantum meruit basis. We agree with plaintiff that such arrangements, as long as they are reasonable, should be encouraged.

In sum, paragraph 17 of the contract reasonably assigns to plaintiff a ratable portion of a given fee on the basis of the stage of the litigation at the time of departure. Although the percentages are arguably imperfect, we do not deem it appropriate to require precision. The contract is a reasonable attempt to relate plaintiff's fee entitlement to the amount of work done on a given file before it left the firm.

*Id.* at 828, 829.

In *M & H Miller v. Jacobs & Goodman*, 699 So. 2d 729 (Fla. App. 1997), the Florida Appellate Court also upheld an agreement that provided for 75% of all contingency fees on cases where the client follows a departing attorney. In that case, the court held that:

[L]awyers are free to enter into agreements which provide for post termination allocation of client fees. We reject M & H's argument that such agreements are unenforceable as against public policy because they place an undue economic burden on a client's freedom to choose legal representation.

699 So. 2d at 732.

The court agrees with the reasoning in the *McCroskey* and *Miller* cases and finds that the percentage fee splitting is not unethical as an impediment on Nathanson's right to practice law.

Nathanson attempts to distinguish the case at bar by arguing that the reasonable value of services performed by the firm is easily ascertainable and should be decided based on quantum meruit. Other courts in similar cases have found that quantum meruit is not the proper way to handle these cases. This court agrees. Aside from the time consuming suits that would be involved with deciding the value of each case that was taken by an attorney who leaves the firm, the problem also involves what value should be given to services such as advertising costs and good will associated with the firm that attracted the client.

Every firm faces the possibility that one of the individual attorneys assigned to a matter could leave with a substantially prepared case. This risk is unavoidable since clients have unfettered discretion to obtain or release counsel. When a lawyer leaves his law firm, a litigation client may understandably elect to follow the person who was most heavily involved with that litigation. This fact of professional life, however, should not deprive the firm whose services the client initially sought from equitably realizing the fruits of its reasonable expectancy in the contingent fee. These include, in addition to recognition of the factor of initial attraction of the client, the quality of the firm's initial investment of time, skill and funds in investigation, construction of pleadings, discovery, choice of experts, research and those other foundational services which shape the ultimate result, good or bad, of every lawsuit.

*La Mantia v. Durst*, 561 A.2d 275, 279 (N.J. 1989).

The New Jersey court stated that the solution to having to come up with a dollar amount for each case is to have "properly drafted partnership and associate agreements" which "fix the allocation and apportionment of contingent fees." *Id.*

The amount of work that would be required to determine the quantum meruit value of each individual case for every attorney that leaves a law firm and takes clients with them is likely to be cost prohibitive and unnecessarily tedious. By setting a predetermined percentage in the employment contract, both parties can receive just compensation for the work done on the case. As stated previously, these percentages may not be exact for each case, but the court will not require that they be precise.

The court finds that the fee arrangement contained in Nathanson's employment contract is not unethical and does not violate public policy. The percentages are a reasonable estimate of the value of work done by Marks & Harrison and the decreasing percentages reflect the stage of the litigation at the time Nathanson left the firm even though the percentages are arguably imprecise. In some instances, a case will settle right away as a result of a tremendous amount of work being done by Nathanson after she left the firm. At the same time, however, a case may not settle for a year, during which time Nathanson may not have devoted much time to it and the settlement is a result of the work done before she left. Again, the percentages and values are not exact, but they are a reasonable attempt to ascertain the value of the work done by both parties and will be upheld. Although the percentages may prove to

cause some financial burden on Nathanson, they are not so overreaching that they restrict her right to practice law.

For these reasons, the demurrer in the declaratory judgment suit is also overruled.