## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Randall E. Appleton
and Randall E. Appleton,
Attorney at Law, P.L.L.C.

v.

Bondurant & Appleton, P.C.,
and Bondurant Law, P.C.

July 5, 2005

Case No. (Law) 04-1106

BY JUDGE MARK S. DAVIS

This matter is before the Court for decision after a non-jury trial. The factual and procedural background of this matter, findings of fact, and conclusions of law are set forth below.

*I. Factual and Procedural Background*

Plaintiffs Randall E. Appleton and Randall E. Appleton, Attorney at Law, P.L.L.C. (hereafter sometimes "Appleton") filed a motion for judgment against Bondurant and Appleton, P.C. and Bondurant Law, P.C.

(hereafter sometimes "Bondurant").[1] Bondurant filed a counterclaim. This Court reviewed, in depth, the allegations contained in the motion for judgment and counterclaim when it denied defendants' motion for summary judgment on February 28, 2005. *Appleton v. Bondurant & Appleton, P.C.*, 67 Va. Cir. 95 (Portsmouth 2005). Therefore, the Court will only here review the broad contours of the allegations of the motion for judgment and counterclaim.

This dispute arises from the departure of Mr. Appleton from the Bondurant law firm. Appleton alleges a breach of contract claim in Count I, asserting entitlement to recover from Bondurant "a sum" which "is to be calculated based on client matters that were successfully concluded prior to the time of Appleton's resignation from Bondurant & Appleton, P.C." In Count II, Appleton seeks recovery in "implied contract or *quantum meruit*," asserting that he is "entitled to recover from [both defendants] a sum to be proved at trial for work performed on client matters that were not concluded as of the date on which Appleton resigned his employment at Bondurant & Appleton, P.C., and such clients having elected to obtain representation at Bondurant Law, P.C." Finally, in Count III, Appleton sought a declaratory judgment regarding entitlement to assert an attorney's lien on "each and every case that was solicited by Mr. Appleton and left the Firm." The Court has previously addressed Count III in its pre-trial rulings.

Bondurant filed a counterclaim alleging that, while Mr. Bondurant was out of town on February 20, 2004, Mr. Appleton informed him that he was "withdrawing from the firm" and then departed with his (Appleton's) secretary, as well as the firm's investigator and "key employee," Herbert Wooten. Based upon such action, Bondurant asserts a breach of fiduciary duty against Appleton in Count I of his counterclaim. In Count II of the counterclaim, Bondurant asserts that "Appleton has chosen to tortiously interfere with the business and business expectancy of The Bondurant Law Firm by filing erroneous and illegal attorney's liens in all of the cases that remained at The Bondurant Law Firm, both in states where Appleton is licensed to do business and in states where Appleton is not licensed to do business." Over the objection of Appleton, the court granted Bondurant's motion to nonsuit Count III of his counterclaim during the trial of this matter. In Count IV, Bondurant seeks a *quantum meruit* recovery, asserting that Bondurant is "entitled to be repaid all costs incurred in each case that

---

[1] Plaintiff Appleton is represented by Charles M. Lollar, Esq., of Tanner, Mulkey, Gordon & Lollar, P.C., and defendant Bondurant is represented by William D. Bayliss, Esq., of Williams Mullen, P.C.

Randall Appleton successfully solicited, as well as a portion of the fees in each case, based upon a fair *quantum meruit* basis to be determined by the Court on a case by case basis."

The Court is asked to make findings of fact and conclusions of law. Of course, the Court must determine and construe the oral agreement of the parties and make determinations regarding compensation. In seeking to reconcile the differing views of that oral agreement, the Court found wisdom in a somewhat similar case involving a dispute between attorneys, *Lawson & Frank, P.C. v. Bettius*, 66 Va. Cir. 93, 93-94 (Arlington 2004), where that court noted that "[a]s time passes and dissatisfaction with an oral agreement arises, the parties' respective memories of the agreement's terms may become hopelessly irreconcilable" and that while "[o]ften, there is no attempt at deception or any subjective dishonesty; parties simply believe that their agreement *must* have addressed the problems they experience in a fashion sympathetic to their plight." However, as in *Lawson & Frank, P.C.*, even though the parties have alleged that each failed to act in good faith based upon their own perception, and even though this Court believes the parties have attempted to act in good faith, "[t]heir memories of the past . . . were clearly not in harmony." *Id.*

After a Court-ordered judicial settlement conference with a retired judge, the parties were unable to resolve their dispute. Therefore, this matter came before the Court for a non-jury trial on April 5-7, 2005. The Court requested proposed findings of fact and conclusions of law, which were submitted by the parties after the trial. The case is now ripe for decision.

## II. Findings of Fact

The Court makes the following findings of fact based upon the evidence presented by the parties in this case.

Walton G. Bondurant, Jr., graduated from the University of Virginia in 1967 and the T. C. Williams School of Law at the University of Richmond in 1970.

Upon graduation from law school, Bondurant went to work for the predecessor law firm of what is currently known as Moody, Strople, Kloeppel, Basilone & Higginbotham, Inc., in Portsmouth, Virginia. While there, he specialized in litigation with a primary focus on Federal Employers' Liability Act ("FELA") cases involving claims against railroads by railroad employees. Bondurant worked at that law firm until 1979 when he left to start his own firm. In 1981 Mr. Bondurant associated with Barney Miller in Portsmouth, Virginia, to form Miller & Bondurant,

a firm that specialized in handling FELA matters. Mr. Miller and Mr. Bondurant were equal equity partners in the firm.

Mr. Bondurant became a member of the Academy of Rail Labor Attorneys (ARLA), which is the organization for plaintiff FELA attorneys, and later served on its Board of Directors. Over a period of thirty-five years Mr. Bondurant has developed a substantial FELA practice due, among other things, to his efforts in establishing a successful law practice and the consequent recognition by the FELA bar and by virtue of his reputation among railroad employees.

Under the management of Mr. Bondurant, the firm grew to a point where it employed five attorneys, one associate attorney in Florida, and a support staff of eight to ten persons. By 2001, the firm employed approximately fifteen people.

Mr. Appleton graduated from Wake Forest University School of Law in 1982 and began working with law firm currently known as Moody, Strople, Kloeppel, Basilone & Higginbotham, Inc., which he left in 1989 to join the firm of Miller & Bondurant as an associate attorney. Mr. Appleton was initially paid an annual salary of approximately $40,000.00 plus a bonus, calculated as a percentage of the net fee on each case he handled for the firm. The bonus package provided for payment to Mr. Appleton of 10% of his net fee once his production reached $175,000.00 in fees generated, and increased incrementally at stages above the base fee. The base of $175,000.00 was derived from Mr. Appleton's calculation of the cost to Miller & Bondurant to support his practice.

Mr. Appleton was always an at-will employee of the Miller & Bondurant law firm, as well as all successor law firms, and had no ownership in the firm up to the point he left the firm in February 2004.

In 1994, Mr. Miller and Mr. Bondurant agreed that Mr. Bondurant would purchase all of the shares of Mr. Miller's stock in the law firm and that Mr. Bondurant would provide a retirement/buyout plan for Mr. Miller through the law firm. This plan was referred to as the Miller & Bondurant Succession Plan and contemplated Mr. Bondurant's succeeding to the full ownership of the firm through the buyout. The succession plan and buyout was to last five years, and Mr. Miller was to remain associated with the firm during those five years. Modifications were later made to this retirement/buyout agreement, and, in 1997, Mr. Bondurant became the sole owner of the firm, and all of its successors relevant to this case, and was the sole corporate director and President of the law firm. Mr. Bondurant was also personally liable for many of the debts of the firm once he became the sole owner. Furthermore, Mr. Bondurant was

responsible for all firm management, including responsibility for human resources issues, accounting issues, overseeing firm marketing, and all other aspects of management. At that time, the attorneys working for the Bondurant law firm included Mr. Bondurant, Mr. Appleton, Joseph Miller, Larry Lockwood, and David Schnitzer.

In 1995, after the succession plan was in place, Mr. Bondurant agreed with Mr. Appleton and another attorney at the law firm, Joseph Miller (son of Barney Miller), to a modified compensation plan where all attorneys would share in the net proceeds of the firm, with Mr. Bondurant receiving forty percent, Barney Miller receiving twenty percent, Mr. Appleton receiving twenty percent, and Joseph Miller receiving twenty percent. In exchange for this potentially larger income, Mr. Appleton agreed to forego the prior arrangement (guaranteed salary plus percentage of his net fees).

When the compensation arrangement changed in 1995 and Mr. Appleton agreed to accept, as his annual compensation, twenty percent of the net proceeds of the law firm, there was no discussion between Mr. Bondurant and Mr. Appleton as to the definition of "net proceeds." This new compensation arrangement also provided that Mr. Bondurant would have total control as to when distributions would be made.

The law firm's average monthly operating expenses in 1995 were approximately $60,000.00, and the average monthly operating expenses by January 2004 were approximately $135,000.00.

From the time that the law firm of Miller & Bondurant was formed, both Mr. Miller and Mr. Bondurant had considerable fringe benefits, including, but not limited to, automobiles, credit cards, gas credit cards, insurance policies, disability policies, and medical insurance. The law firm paid the premiums on term life policies provided to both Mr. Miller and Mr. Bondurant.

On December 10, 1997, Mr. Bondurant recorded the following in the corporate records:

> I met with Johnny Ellis on December 8, 1997, and right now, with Johnny Ellis as my agent, I have $500,000 term insurance and I have $100,000 whole life insurance that is a split-dollar pay that the corporation pays the premiums and the corporation is entitled to get all the premiums back and Nancy [Mrs. Bondurant] would get the death benefit of approximately $100,000. I also have a $23,000 policy which is a term policy which is paid up and has no premiums.

We are going to take the $500,000 term policy and the $23,000 term policy and convert them to a $523,000 Mass. Mutual Life Insurance Company whole life policy that will have a premium of approximately $31,000 per year, most of which is paid by the corporation with non tax deductible dollars and a little bit of which is paid by WGBJr.

That $523,000 whole life policy will have a high cash value from the beginning and will be paid out by the corporation over a ten year term and will give me the rights to take a loan against the policy either in lump sum or an annual figure after I retire from M&B and it will also give M&B the right to recoup its premiums paid in upon my death (at my official retirement from M&B it is possible to negotiate as part of my settlement package two things (a) that the corporation continue to pay the premiums on the policy and continue out the ten year term and (b) it is even possible to negotiate that the corporation would give up the death benefit premium recoupment in favor of the beneficiary, Nancy G. Bondurant. [sic] The agreement on (b) is that they would agree to take the death benefit, put it in their account and then just pay out an amount equal to that to my beneficiary as part of the retirement agreement.

On December 15, 1997, Mr. Bondurant recorded the following in the corporate records:

I am doing the Massachusetts Split Dollar Life Insurance Policy and one of the assignments is that WGB is assigning to Miller & Bondurant, Ltd., the whole $523,000 in death benefits. If WGB should die while he still owns all the stock, that is not too much of a problem, but if he dies after he starts making a deal with RA, JM and whomever to transfer out some of the stock, then I must have an "understanding" with them that the corporation will get back the premiums that it has paid in, but that it has to give the rest of the money back over to Nancy Bondurant or, depending on how the negotiations go for the stock of Miller & Bondurant, I can also make an "understanding" that they pay the whole thing over to Nancy Bondurant, but the $523,000 is going to go into Miller & Bondurant, but it has to be paid out to Nancy depending on the

deal we make. Either the whole $523,000 or $523,000 less the monies that Miller & Bondurant put into the premiums.

Mr. Bondurant's plan was to prepare for his own retirement from the law firm with this $523,000.00 insurance policy providing a vehicle by which he could put in place part of a retirement package providing assurance that the law firm would continue to pay the premiums on the policy and continue to do so for a ten year term, and that the $523,000.00 policy and its premiums could be the basis for the buyout of the stock in Miller & Bondurant, all as explained in these memoranda.

Mr. Bondurant never specifically told Mr. Appleton or Joseph Miller of this $523,000.00 split dollar life insurance policy and the payment of premiums of such policy because neither of them ever became owners of the firm. After preparation of the December 15, 1997, memorandum described above, the law firm's accountant advised Mr. Bondurant that the premiums on the split dollar life insurance policy should be paid by Mr. Bondurant directly, with the money to make the premium payments coming to him directly as income before he paid it out to Massachusetts Mutual. Therefore, Mr. Bondurant maintained a specific account for the money he received from the law firm for the purpose of making these premium payments. He took taxes out of the money and then put it in a stock account for use in paying the premiums.

In 1999, Mr. Bondurant terminated Joseph Miller and changed the name of the law firm to Bondurant & Appleton, P.C. Mr. Bondurant also modified the existing compensation arrangement at the same time, such that Mr. Bondurant would receive two-thirds of the net proceeds of the law firm and Mr. Appleton would receive one-third of the net proceeds of the law firm. Part of the impetus for this change was an understanding reached between Mr. Bondurant and Mr. Appleton that Mr. Appleton would become more involved in the administration and management of the law firm and increase his workload. At the time this change took place,. there was no discussion between Mr. Bondurant and Mr. Appleton about what constituted the "net proceeds" of the law firm, nor did Mr. Appleton request to review the law firm's accounting records to determine how "net proceeds" were being determined.

In 1999, Mr. Bondurant began to discuss with Mr. Appleton a succession plan that would enable Mr. Bondurant to begin the process of retirement with a buyout by Mr. Appleton.

In conjunction with the termination of Joseph Miller and based upon the advice of counsel with the law firm of Kaufman & Canoles, on

October 1, 1999, a corporate resolution was adopted once again modifying the compensation plan and setting the annual base salary for the four attorneys as follows: $150,000.00 for Mr. Bondurant, $75,000.00 for Mr. Appleton, $42,000.00 for Larry Lockwood, $31,000.00 for David Schnitzer. This resolution was adopted during the time frame that Joseph Miller had been relieved of his duties, retained an attorney and made a claim against the corporation for monies he claimed he was due as a *"de facto* partner" as a result of having been paid a percentage of the law firm profits.

Mr. Bondurant testified that he recalled sitting in Mr. Appleton's office in 1999 and advising him of this corporate resolution and the base salary attributable to Mr. Appleton. Mr. Appleton testified he had no memory of any discussion regarding such a resolution or base salary. Because of the clarity of Mr. Bondurant's recollection and because of the fact that it seems likely Mr. Bondurant would have advised Mr. Appleton of such action after their experience with Joseph Miller, the Court finds that, in 1999, Mr. Bondurant advised Mr. Appleton of the modified compensation plan outlined in the October 1, 1999, corporate resolution and thereafter the law firm operated under that plan, with each lawyer being guaranteed the base salaries listed therein, yet with Mr. Bondurant and Mr. Appleton receiving a percentage of the net proceeds of the law firm, as long as they exceeded the base salary, pursuant to an oral agreement. In making this finding, the Court does not find that Mr. Appleton intentionally misrepresented the facts. As noted above, memories fade and become conformed to developments in the context perceived by each party. On December 23, 1999, the law firm Board of Directors, consisting solely of Mr. Bondurant, adopted a resolution providing that the corporation "shall pay annually the sum of $50,000.00 to net a sum sufficient for Bondurant to pay the Mass Mutual life insurance policy #11536340 which premium is approximately $32,000 annually." As a result of this resolution, in 2001, 2002, and 2003, Mr. Bondurant received annual payments of $50,000.00 for the payment of $31,800.00 annual premiums and the taxes on such payments. In each of these years, Mr. Bondurant received two checks of $25,000.00. From each check $10,000.00 was designated for payment of FICA and Federal taxes and $15,000.00 was designated for payment to Mr. Bondurant. Mr. Bondurant deposited those checks into a Davenport & Company equity savings account, kept the money separate and did not co-mingle it with any other funds. Mr. Bondurant withdrew the funds when the insurance premiums were due in December and used the $30,000.00, in addition to

$1,800.00 of his own funds, to pay the premium in order to keep the insurance policy on his life.

The law firm was successful, and even up to the time Mr. Appleton left the law firm in 2004, the attorneys received annual income in excess of the guaranteed floor outlined in the resolution. The law firm also provided Mr. Appleton and Mr. Bondurant with significant fringe benefits including vehicles, marketing expense reimbursements, as well as health and disability insurance. At the time Mr. Appleton left the firm, he was provided: a 2003 Ford Explorer at an annual cost of $9,224.88, and has received a similar leased vehicle approximately every two years while at the law firm; annual auto insurance on that vehicle of approximately $796.54; annual medical insurance for himself and his family with premiums of approximately $13,001.64; life insurance with premiums of $229.44; and a pension benefit that totaled $165,244.38 since its inception in 1989. Of course, the law firm also paid Mr. Appleton's professional liability insurance premiums, his credit card expenses connected with his work, and his gasoline expenses connected with his work.

In conjunction with the modified compensation plan adopted in 1999 and in addition to the guaranteed salary, Mr. Bondurant advised Mr. Appleton of an increase in the percentage of net proceeds that Mr. Appleton would thereafter receive. As noted above, under the revised plan, Mr. Bondurant would receive two-thirds of the law firm's net proceeds and Mr. Appleton would receive one third of the law firm's net proceeds. Mr. Lockwood was paid a salary plus a bonus on a percentage of the recovery awarded to a client, similar to Mr. Appleton's initial compensation plan.

In June 2000, Larry Lockwood resigned his position with the law firm while Mr. Bondurant was out of town. Mr. Lockwood's secretary also left the employment of the law firm at this same time, and Mr. Lockwood removed twenty-five case files from the law firm's offices.

Mr. Appleton was instrumental in overseeing the law firm's effort to protect its interest in the twenty-five cases removed by Mr. Lockwood. Mr. Appleton also agreed to accept additional responsibility as a result of Mr. Lockwood's departure. Prior to Mr. Lockwood's departure, he and Mr. Appleton handled the asbestosis claims within the law firm. Mr. Bondurant assumed control of most of Mr. Lockwood's asbestosis cases, significantly increasing his caseload. As a result of these efforts by Mr. Appleton and in light of Mr. Bondurant's belief that Mr. Appleton was going to ultimately buy out his interest in the law firm, Mr. Bondurant again modified the compensation plan such that Mr. Bondurant would

receive sixty percent of the net proceeds of the law firm and Mr. Appleton would receive forty percent of the net proceeds of the law firm. Mr. Bondurant advised Mr. Appleton that every time Mr. Bondurant received his sixty percent, Mr. Appleton would receive his forty percent, with the existing base salary remaining in place.

After Mr. Lockwood left the law firm, he placed a lien on the remaining law firm files and claimed that he was entitled to proceeds and profits from the firm even after he left. Mr. Lockwood also claimed that he was entitled to all of the proceeds for the twenty-five cases he solicited and removed from the law firm.

On November 22, 2000, Mr. Appleton wrote Mr. Lockwood as follows: "You resigned as an associate with our firm on June 16, 2000, and were compensated for your services as an employee. There is no basis in law or fact to support your assertion of a claim to proceeds for cases you worked on as a primary counsel resolved subsequent to your resignation. In addition you have no right to receive or retain fees due this firm based upon claims which do not involve your efforts . . . your action in holding hostage fees owed to Bondurant and Appleton, in an attempt to extract money that is not owed to you, is highly inappropriate." During this same time period, Mr. Appleton loaned the law firm $5,084.00, and the firm has never repaid this amount.

In July 2001, Mr. Bondurant and Mr. Appleton met with Andrew Hook, Esq., to discuss the preparation and execution of a law firm succession plan whereby Mr. Appleton would buy out Mr. Bondurant. Mr. Bondurant would periodically make reference to this succession plan after the meeting with Mr. Hook, but Mr. Appleton never expressed an interest in proceeding with such a succession plan. Mr. Appleton had concerns about Mr. Bondurant's management style, and his decisions regarding the proper method of handling certain types of cases, and believed that Mr. Bondurant was not working full-time hours at the law firm. Therefore, Mr. Appleton declined to pursue discussions regarding a possible succession plan.

After subtracting the disputed payments for insurance described above, in 1999, when the net proceeds agreement was two-thirds to Mr. Bondurant and one-third to Mr. Appleton, Mr. Bondurant was paid approximately $428,141.00 (63%) and Mr. Appleton was paid approximately $254,241.00 (37%); in 2000, when the net proceeds ratio changed mid-year to 60% to Mr. Bondurant and 40% to Mr. Appleton, Mr. Bondurant was paid approximately $290,650.00 (66%) and Mr. Appleton was paid approximately $151,350 (34%); in 2001, Mr.

Bondurant was paid approximately $428,850.00 (61%) and Mr. Appleton was paid approximately $278,400.00 (39%); in 2002, Mr. Bondurant was paid approximately $318,000.00 (59%) and Mr. Appleton was paid approximately $218,000.00 (41%); in 2003, Mr. Bondurant was paid approximately $190,000.00 (61%) and Mr. Appleton was paid approximately $120,000.00 (39%). These payments were in addition to the annual fringe benefit packages, which exceeded $45,000.00 for Mr. Appleton. Mr. Appleton has also received approximately $136,000.00 in pension contributions made solely by the law firm during his employment and will receive approximately $240,000.00 in the future as a result of two annuity policies based on compensation by the law firm. Mr. Bondurant awarded law firm staff bonuses in the amount of $695,000.00 between 1994 and 2004, and he never consulted with Mr. Appleton regarding the award of such bonuses.

The law firm paid medical insurance benefits for Mr. Appleton that exceeded those paid for Mr. Bondurant by $7,200.00 per year, immediately preceding Mr. Appleton's departure.

In addition to draws and other fringe benefits, between 2001 and 2003 Mr. Bondurant received payments totaling approximately $227,000.00 which he used for payment of the premiums on the Mass Mutual split dollar life insurance policy and for payment of the taxes on such premiums. In addition to the $227,000.00 paid by the law firm to Mr. Bondurant for the purpose of paying these premiums and associated taxes, the law firm made additional direct payments to Mass Mutual between 2001 and 2003 totaling $17,309.28 as premiums on a separate disability and small life insurance policy on Mr. Bondurant.

Beginning in late 2002 and continuing through 2003, the law firm began a decline in profitability that resulted in numerous attorney/staff meetings seeking to rein in expenses. At the end of January 2004, the law firm was essentially out of cash. As a result of the declining income and increasing expenses of the law firm, Mr. Bondurant personally guaranteed a law firm credit line with Towne Bank and drew down on the credit line in order to pay the expenses of the law firm in January 2004. By February 20, 2004, the law firm had debts of approximately $192,398.62 and did not have sufficient funds on hand to meet its debts, though there were outstanding cases on which the law firm expected to receive fees.

Between January 1, 2004, and February 20, 2004, Mr. Appleton was paid $14,000.00 as compensation by the law firm and Mr. Bondurant was paid $21,000.00 as compensation by the law firm. Mr. Appleton's portion

of the total paid during that time frame was forty percent, and Mr. Bondurant's portion was sixty percent.

In January 2004, Mr. Appleton tried a case in Tennessee and then returned to Portsmouth. Upon receiving his W-2 tax form at the end of January and seeing how small it was, Mr. Appleton telephoned Mr. Bondurant to discuss the issue. That telephone conversation was not amicable. In early February 2004, Mr. Appleton met with Mr. Bondurant to discuss his workload. As a result of this meeting, Mr. Bondurant transferred to himself and Mr. Schnitzer many of the cases previously assigned to Mr. Appleton.

On February 9, 2004, Mr. Bondurant convened a meeting of the law firm attorneys and support staff to discuss the need to reduce expenses. Mr. Bondurant distributed a memorandum outlining various policies intended to make such expense reductions, including limitations on the quantity of work to be performed on certain files. The memorandum alluded to the possibility that some of the law firm's employee's might eventually be terminated in the effort to control expenses. This meeting occurred in a very tense atmosphere. After the meeting, two non-attorney firm employees submitted their resignations. Additionally, Ms. Wyatt and Ms. Balance submitted their resignations, though Ms. Balance subsequently withdrew such resignation.

After the February 9, 2004, meeting, Mr. Appleton discussed (after office hours and away from the law firm's offices) with Mr. Wooten and Ms. Wyatt the possibility of starting a new law firm. On February 11, 2004, Mr. Appleton decided to leave the law firm. Mr. Appleton spoke to Mr. Bondurant, who was out of town, on Friday, February 20, 2004, and advised Mr. Bondurant that he was leaving the law firm. Mr. Wooten then came to the telephone and also advised Mr. Bondurant that he would be leaving the law firm.

Mr. Appleton began operating his new law firm on Monday, February 23, 2004. Mr. Wooten and Ms. Wyatt began working with Mr. Appleton at that time in his new law firm.

Mr. Appleton removed the files of twenty-six cases from the law firm after having been retained by, and obtaining permission to do so from the clients in such twenty-six cases. One of those twenty-six clients retained Bondurant in 2000, another retained Bondurant in 2002, approximately thirteen retained Bondurant in 2003, and approximately three retained Bondurant in 2004. Approximately fourteen of these cases had been settled/resolved by the time of trial in April 2005, some fourteen months after Mr. Appleton's departure. Mr. Appleton estimated that, on

twenty of these twenty-six cases, he worked 200.15 hours before his departure, and 429.54 hours after his departure, equating to a split of 32% before departure, and 68% after departure. When Mr. Bondurant began the process of estimating time spent on these cases, he concluded his evaluation based upon a much smaller number of the cases, but reached a vastly different pre-departure figure of 82%, and a post departure figure of 18%. Additionally, Mr. Bondurant provided descriptions of the cases and work in his Method B Supplements for many of the cases, as reflected in Defendants' Exhibit # 94. While it is true that Mr. Appleton had more direct responsibility for handling these cases than did Mr. Bondurant, the Court finds that neither party's estimates are entirely accurate and that no precise time figure can be reached based upon the evidence before the Court. However, the court also finds that the Bondurant law firm was retained at least six months prior to Mr. Appleton's departure with respect to at least twelve of these files.

The law firm of Bondurant & Appleton advanced approximately $26,542.00 in expenses on the twenty-six cases prior to Mr. Appleton's departure from the law firm. At the time of trial, some of those expenses had been reimbursed by Mr. Appleton's new firm, but $18,991.00 remained outstanding.

Mr. Appleton seeks *quantum meruit* recovery against the following settled cases that remained at Bondurant & Appleton after his departure but on which he worked while still at the law firm: Armstrong, Conner, Duncan, Forrest, Gordon, Jackson, Ludlum, Mabine, Martin, Northcraft, Overton, Shaw, and Stassinos. Of these now-settled cases which remained at Bondurant & Appleton after February 20, 2004, and on which Mr. Appleton worked before February 20, 2004, the total fees collected by Bondurant & Appleton was $31,044.96. Prior to February 20, 2004, Mr. Appleton estimated that he worked a total of approximately 35.82 hours on these cases.

Mr. Appleton seeks *quantum meruit* recovery against funds recovered in the following pending cases that remained at Bondurant & Appleton after his departure: Grier, House, Rasch, Bowers, Bryant, Collins, Wysinger, Grant, Griffith, Young, Simmons, Gordon, Jenkins, Johnson, L. Scott, R. Scott, Tomlin, Veale, Watkins, Rogers, and Aswad. Of the still pending cases which remained at Bondurant & Appleton after February 20, 2004, and on which Mr. Appleton worked before February 20, 2004, the total amount of time estimated as worked by Mr. Appleton was approximately 29.82 hours.

Approximately twenty-six Bondurant & Appleton clients terminated their relationship with Bondurant & Appleton and retained Randall E. Appleton, P.C., as their new counsel. Of those twenty-six cases, at the time of trial in this matter, approximately fourteen case files had settled or were awaiting judicial approval of settlement. The total amount of fees recovered in those fourteen cases was approximately $241,935.79.

### III. Conclusions of Law

### A. Appleton's Breach of Contract Claim

The essential elements of a contract are offer and acceptance, with valuable consideration. *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980). As the Court found above, there was an at-will employment contract in place at the time of Mr. Appleton's departure providing for annual compensation of forty percent of the law firm's net proceeds with a guaranteed minimum annual compensation of $75,000.00. *Layton v. MMM Design Group*, 32 Fed. Appx. 677, 2002 U.S. App. LEXIS 5789, **12 (4th Cir. 2002) (unpublished disposition) (though it is described as at-will employment because no term of duration is agreed upon, the employment relationship is a contractual one and is defined by its non-durational terms). However, Mr. Bondurant and Mr. Appleton never defined the meaning of "net proceeds."

The proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690 (1990), *rev'd on other grounds*, 263 Va. 20, 23, 556 S.E.2d 767, 768 (2002). Therefore, since Mr. Appleton alleges that Mr. Bondurant breached the employment contract between himself and the law firm, he bears the burden of proof by a preponderance of the evidence.

"The law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency. While courts cannot make contracts for the parties, neither will they permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances. This is especially true where there has been partial performance." *Reid v. Boyle*, 259 Va. 356, 367, 527 S.E.2d 137, 143 (2000).

When determining the agreement's scope, the intention of the parties should be determined and given effect. *Id.* In doing so, the following facts

must be considered: (A) the situation of the parties; (B) the subject matter of the agreement, and (C) the object which the parties intend to accomplish. However, a construction that may be consistent with the tenor of the agreement but is unreasonable or unequal should be avoided, and "that construction which is most obviously just" is favored as most in accordance with the parties presumed intentions. *Id*.

Mr. Appleton contends that, during the discovery process leading up to the trial of this case, he discovered for the first time that in calculating the net proceeds, pursuant to his agreement with Bondurant, Mr. Bondurant made substantial supplemental payments to himself that were used to pay the premiums of a split dollar whole life insurance policy on himself and that such payments should not have been treated as expenses of the firm in calculating net proceeds. Mr. Bondurant contends that such payments are legitimate expenses of the law firm and that they were used to lay the foundation for a retirement/buyout arrangement with Mr. Appleton, somewhat similar to what had been done with Mr. Miller when he retired from the law firm. In its determination of the "net proceeds" of the law firm, the Court should only utilize an expense drawn out by a person, who owned all of the stock of the corporation, if vouchers or adequate explanation is provided by such owner as to what such expense was used for. *See Morehouse v. Kelly Contracting*, 95 N.J. Eq. 280, 122 A. 374, 1923 N.J. LEXIS 717, ***10 (1923). The maintenance of a life insurance policy on the life of a corporation's president is generally considered a legitimate expense and serves a valid corporate purpose. *Henry v. J.B. Publishing Co.*, 54 Mich. App. 409, 414, 221 N.W.2d 174, 176 (1974). Whether the premium payments (made through Mr. Bondurant and directly by the firm) on the life and disability policies at issue here are properly included in the law firm's expenses in order to determine the "net proceeds," must also be examined in light of the purpose behind such a net proceeds percentage agreement. The split-dollar life insurance policy at issue here required higher premiums than the prior term life policy the law firm paid on Mr. Bondurant and it was used in part for anticipated retirement and succession purposes. Such retirement and succession purposes are clearly legitimate purposes for a professional corporation such as the law firm in this case. Additionally, the payment of disability insurance premiums of a law firm's executive is clearly a legitimate purpose for a professional corporation such as the law firm at issue here. Since payment of life and disability insurance premiums can be a legitimate business expense and since Mr. Bondurant has submitted substantial evidence showing the legitimate purpose of such premium

payments, the burden of going forward then shifts to Mr. Appleton to show such premium payments were not legitimate. Mr. Appleton presented no convincing evidence that such payments lacked legitimacy as a business expense, particularly where the meaning of "net proceeds" was left undefined. Indeed, Mr. Appleton must bear some of the risk inherent in leaving this term ("net proceeds") undefined since he never took steps to ascertain how the law firm's "net proceeds" were calculated. While the Bondurant law firm was paying for term life insurance on Mr. Bondurant before that policy was converted to the split dollar life insurance policy and while the premium payments were much higher for the split dollar policy than for the term policy, the Court cannot say it was an illegitimate expense. Additionally, the Court notes that the ostensible purpose behind such a net proceeds percentage agreement is to encourage the employee to increase the net proceeds so that his percentage is calculated on a higher figure. It can be said that the payment of such life insurance and disability premiums (directly or indirectly) encourages that end because such policies were put in place to facilitate the succession of Mr. Appleton to ownership in the firm and to encourage Mr. Bondurant's retirement (leaving Mr. Appleton as an owner of the firm) based upon having such policies in place. Mr. Bondurant attempted to put in place the mechanics for a succession and buyout, just as had been done with Mr. Miller, and this was in furtherance of that plan. Mr. Appleton apparently decided to avoid the issue by disengaging from such discussions – ultimately leaving the law firm. While the Court can imagine better ways for both Mr. Bondurant and Mr. Appleton to handle the deteriorating situation, as well as the unknown quantity of "net proceeds," each of them has to bear the risk inherent in the lack of clarity surrounding the employment arrangement. At the very least, Mr. Appleton's decision to disengage, when Mr. Bondurant sought to address succession and buyout, inured to Mr. Appleton's benefit because he was able to continue drawing a substantial compensation package without directly addressing his differences with Mr. Bondurant. This benefited Mr. Appleton until the firm's profits began to diminish and his relationship with Mr. Bondurant began to deteriorate, at which time he decided to depart. In such a situation the Court is supposed to consider, among other things, the object that the parties intended. By failing to engage Mr. Bondurant in serious discussion regarding succession and buyout, an uncertainty was created in the employment relationship. Based upon the evidence this Court heard, while both parties bear responsibility for this unfortunate situation, Mr. Appleton bears the greater risk for this uncertainty, and treating the

insurance premium payments as expenses does not place an unreasonable construction upon the object which the parties intended. Therefore, Appleton has failed to carry the burden to prove a breach of contract based upon the inclusion as expenses of the split dollar whole life insurance premiums (paid through Mr. Bondurant and by the firm) or the disability insurance premiums, and Mr. Appleton's breach of contract claim regarding such premium payments must fail.

Mr. Appleton also claims that Bondurant breached the oral agreement by failing to pay him forty percent of the net profits collected by the law firm from January 1, 2004, through February 20, 2004. The facts found by the Court above are that the law firm had $195,000.00 in debts as of February 20, 2004. Mr. Appleton contends that the Court should examine the firm's receipts for January 2004 and February 2004 separately and that the Court should utilize the firm's "normal operating expenses" for January 2004 in calculating "net proceeds" for January 2004 alone. This contention ignores that fact that the law firm historically paid its "net proceeds" disbursements when it determined it was appropriate, and Mr. Appleton acquiesced in such practice. Mr. Appleton was paid approximately $14,000.00 in 2004. This figure exceeds the proportionate amount of his guaranteed salary and therefore no breach of contract took place. *See Fujimoto v. Rio Grande Pickle Co.*, 414 F.2d 648, 653 (5th Cir. 1969). Furthermore, as the Court recognized in *Fujimoto*, 414 F.2d at 655, in calculating net profits, expenses and receipts cannot be segregated by time periods where expenses were incurred in one time period but corresponding profits were reaped in a subsequent time period. Applying these principles to the facts in this case, there was no breach of contract with regard to the January–February 2004 compensation claimed by plaintiff.

### B. Appleton's Loan to the Firm

Mr. Appleton is entitled to be repaid for the $5,084.00 loan he made to the firm, and there seemed to be no dispute about that during the trial.

### C. Appleton's Quantum Meruit Claim

Plaintiff claims he is entitled to recover for work performed on client matters that were not concluded as of the date on which Mr. Appleton left the law firm on February 20, 2004. The Court addressed the law applicable to this claim in its prior Opinion and Order of February 28, 2005. As the Court said at that time, commenting on the employment

contract at issue in *Marks & Harrison v. Nathanson*, 48 Va. Cir. 407, 412-13 (Richmond 1999), "absent an agreement providing otherwise, an attorney who departs a law firm is entitled to be compensated for work that she provided the firm prior to her departure, just as the firm is entitled to be compensated for work it performed on cases that left with the departing attorney." *Appleton*, 67 Va. Cir. 95, 104 (2005). However, the Court went on to observe, on the alleged facts of this case, that "[i]f Bondurant is correct in his assertion that Appleton was solely an at-will salaried employee, then Appleton should not be able to recover for unjust enrichment because the payment of a salary represents payment for work performed during the term of such employment, unless an agreement provides otherwise." *Id.* at 105-06; *see Murphy v. Haws & Burke*, 235 Pa. Super. 484, 488-89, 344 A.2d 543, 546 (1975) (party who has received and accepted salary with no agreement, express or implied, for payment of bonuses, but who from time to time received gratuitous bonuses, may not sue for additional compensation under a theory of *quantum meruit*). Here, we have a hybrid arrangement consisting of both a salary and a net proceeds percentage compensation package. The employment at-will contract between the parties began with the payment of a salary plus a limited bonus per case and was transformed into payment of a percentage of law firm net profits with a guaranteed salary base. There was absolutely no discussion between Mr. Appleton and Mr. Bondurant as to the meaning of "net proceeds." Similarly, there was no discussion as to what the base guaranteed salary was intended to cover or what the "net proceeds" percentage payment was intended to cover. While it may be true that, in the absence of an agreement, or circumstances, providing otherwise, an attorney who departs a firm is entitled to be compensated for work that he provided the firm before his departure, we have an agreement and circumstances here that militate against such a construction, in effect providing otherwise. Under these circumstances, the plaintiff bears the burden of proving his entitlement to *quantum meruit* relief. As this Court noted in its prior Opinion and Order, even though the defendant may have benefited from the plaintiff's services, the latter cannot recover unless he can show sufficient additional facts that imply a promise to pay. *Appleton*, *supra*, at 101. A critical component of the implied promise to pay is proof that the circumstances "reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Myrex Industries, Inc. v. Ortolon*, 126 S.W.3d 548, 550-51 (Tex. App. 2003). The oral agreement being silent on this issue, and the oral agreement providing for a base

salary, Appleton failed to carry the burden of proving that Bondurant accepted the services of Mr. Appleton under such circumstances as reasonably notified Bondurant that Mr. Appleton expected to be paid, after his departure from the firm, for work he performed before his departure. The absence of any discussion of this issue by the parties and the salary component of Mr. Appleton's compensation plan precludes any such reasonable expectation. Therefore, Appleton's claim for *quantum meruit* relief is denied.

### D. Bondurant's Quantum Meruit Claim

The parties disagree as to the proper method of determining Bondurant's entitlement to *quantum meruit* payment for the cases that left with Mr. Appleton. As the Court understands the position of the parties, they agree that Bondurant is entitled to be reimbursed for all costs expended on such case files, before their departure, and that will take place no matter how the Court resolves the *quantum meruit* issue. Furthermore, there is no question that Bondurant is entitled to receive payment for work performed on cases prior to their departure from the Bondurant firm. *Po River Water and Sewer v. Indian Acres Club*, 255 Va. 108, 114, 495 S.E.2d 478, 482 (1998) (to avoid unjust enrichment, equity will effect a contract implied in law requiring one who accepts and receives the services of another to make reasonable compensation for those services); *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 391, 397 (E.D. Va. 1984). The Court agrees that Bondurant is entitled to such *quantum meruit* relief. Therefore, the Court must decide which method is appropriate for determining the proper compensation.

The law in Virginia is "clear that, when . . . an attorney employed under a contingent fee contract is discharged without just cause and the client employs another attorney who effects a recovery, the discharged attorney is entitled to a fee based upon *quantum meruit* for services rendered prior to discharge and, as security for such fee, to the lien granted" by Va. Code § 54.1-3932. *Hughes v. Cole*, 251 Va. 3, 23, 465 S.E.2d 820, 833 (1996).

When a discharged attorney, in a contingent fee context, seeks recovery for work performed before the discharge, the "*quantum meruit* determination looks to the reasonable value of the services rendered, not in benefit to the client, but, in themselves." *Heinzman v. Fine, Fine, Legum & Fine*, 217 Va. 958, 964, n. 4, 234 S.E.2d 282, 286, n. 4 (1977). In the present case, Bondurant was discharged when twenty-six clients of

the Bondurant law firm authorized the transfer of their case files to the Appleton law firm. Some of those cases have resolved, some are yet to be resolved through settlement, trial, or some other manner. In any case, the claim of the Bondurant law firm is against the clients and their recoveries. However, to the extent that Appleton is retaining the contingent fee on each case, pursuant to his agreement with the client, and since the *quantum meruit* recovery cannot be more than the contingent fee, asserting the claim against the fee is, in effect, asserting it against the former client. *See Guess v. Parrott*, 160 N.C. App. 325, 331, 585 S.E.2d 464, 468 (2003) (recognizing discharged attorney may pursue *quantum meruit* action against settling attorney rather than client).

When making the determination as to a reasonable value of services rendered by an attorney in a *quantum meruit* context, the Court considers the following factors:

> The amount and character of the services rendered; the responsibility imposed; the labor, time and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so. The result secured by the services of the attorney may likewise be considered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a *quantum meruit*, not from the standpoint of their value to the client.

*County of Campbell v. Howard*, 133 Va. 19, 51, 112 S.E. 876, 885 (1922).

Appleton contends that the Court should, in determining how to split the contingent fee awards at issue in this case, determine the percentage of time worked on each case before termination of the attorney-client relationship and then multiply that percentage by the contingent fee collected. Bondurant contends that it would be appropriate for the Court to utilize any of four different methods reviewed at trial and designated as Bondurant Methods A, B, C & *Marks* method, which look at law firm expense estimates and percentages based on various time frames, among

other things. The Court agrees that reference to accurate contemporaneous time records would be particularly helpful in making this determination. However, the Court recognizes that any attempt to determine the amount of time devoted to each file is problematic because time records were not kept in the contingent-fee cases. While Mr. Appleton attempted to reconstruct the amount of time he spent working on the cases, these are only rough estimates reconstructed long after the fact, just as are Mr. Bondurant's estimates. Mr. Bondurant has used various methods to capture the amount of time and effort that the law firm devoted to each case, without providing a specific time estimate for each case. The Court, however, can render a *quantum meruit* award without knowing the exact amount of time spent on each case since the *Howard* factors require the Court to consider more than just the "amount . . . of services rendered." *Howard*, 133 Va. at 51, 112 S.E. at 885, and the amount of services can be measured by methods other than hours.

The Court applies the *Howard* factors as follows.

### (a) Amount and Character of Services Rendered

While the time estimates provided by Appleton are helpful, and the Court has considered them, Mr. Bondurant contends they do not account for much of the up-front time and effort he invested in establishing the law firm as a FELA firm and marketing that expertise in the FELA field of law. However, these considerations are discussed below regarding other "factors." Mr. Bondurant also estimated time spent on these files. Mr. Bondurant testified that each case came in to the law firm through him and that he then conducted an initial evaluation, utilizing his experience in the FELA field of law to direct that certain things be done unique to each case. Mr. Bondurant then assigned the file to one of the attorneys in the law firm and remained available for consultation as to those files that were not assigned to him. In some cases, Mr. Bondurant directed that additional investigation take place after his evaluation. The pure application of an "amount and character of services" analysis would, Mr. Bondurant contends, underestimate the reasonable compensation due the law firm for all of his services and those of the investigator and other support staff. In other words, Mr. Bondurant contends that the law firm is entitled to more than a simple hourly wage for his services rendered on each case. Mr. Bondurant's contention cannot be disregarded. *Guess*, 160 N.C. App. at 336, 585 S.E.2d at 471 (court should consider services expended by paralegals and secretaries acting as paralegals, if reasonable to do so). He

described in some detail at trial the efforts that were made by the firm investigator, Mr. Wooten, and other support staff. For example, in describing Bondurant Method A, as it applied to the Allen case, Mr. Bondurant submitted in Defendant's Exhibit # 94 that the investigator works to secure the representation of the client and investigate the facts of the case (from the client and witnesses). Mr. Bondurant also describes the significant efforts of support staff to prepare letters and pleadings in the case, going into some detail in the Method B supplements for many of the cases, as reflected in Defendant's Exhibit # 94. The non-attorney time described by Mr. Bondurant is precisely the kind of time that would normally be reflected on the client statement in a case handled on an hourly billing arrangement. Therefore, Mr. Bondurant makes a strong argument that this time must be considered in addition to attorney time. However, the Court does not agree that the extensive marketing efforts, that pre-date the work on each case, must be considered in analyzing *this* factor's application to such case. Such efforts may, however, be considered to some extent in other factors reviewed below.

### (b) The Responsibility Imposed

During the time that each case file remained at the law firm, Mr. Bondurant had overall responsibility. Mr. Bondurant was, in essence, the owner of the firm. He was responsible for evaluating each file when it came to the firm, writing the initial letters, and for assigning such files and directing investigation or initial follow-up. Mr. Bondurant had to determine which attorney could best handle the particular file, and he had to make suggestions/directions to the assigned attorney and other staff regarding the handling of the file.

### (c) The Labor, Time, and Trouble Involved

As noted above, the amount of time is not the only factor to be considered in a case like this. The Court is aware of the fact that both Mr. Bondurant and Mr. Appleton had developed a special expertise in handling FELA cases and other personal injury cases and that the labor, time, and trouble for them to handle a case might be significantly different than for a non-FELA personal injury specialist to handle a case.

## (d) The Character and Importance of the Matter in Which the Services Are Rendered

As both Mr. Bondurant and Mr. Appleton pointed out at trial, a FELA case is handled differently than an automobile accident case, in general. However, they are in many respects the same, with the necessity to prove required elements of the cause of action, as well as damages. Of course, for a variety of reasons, damage awards in FELA cases are typically larger than other tort cases, as will be discussed below.

## (e) The Amount of the Money or the Value to be affected

As noted above, the value of an FELA case is typically larger than the usual non-FELA tort case that comes before the Court. The non-FELA cases also involve similar values.

## (f) The Professional Skill and Experience Called For

In Defendant's Exhibit # 94, Mr. Bondurant explained how he calculated the *quantum meruit* recoveries on the cases based upon various theories. In describing Bondurant Method A, Mr. Bondurant provided the following statement regarding the manner in which clients come to the firm in support of his theory of compensation:

> FELA law is a very narrowly focused specialty practiced full time by less than 200 lawyers in the United States. The Association of Rail Labor Attorneys (ARLA) is a group of lawyers throughout the country dedicated to the highest standards of representation of injured railroad workers. Bondurant is a member of the Board of Directors of ARLA.

> Attached hereto is a copy of the ARLA membership roster. Clearly, the number of lawyers involved in the organization, which is the only one of its type in the country, represent a minute fraction of lawyers in the country. The specialty is so narrow that there is on one hand a small number of attorneys for injured railroad workers to choose from, but on the other hand, there is intense competition among the lawyers who specialize in this field.

The common practice for all lawyers specializing in FELA work is to be designated as legal counsel for one or more of the unions and to have one or more employees acting as "field representatives" or "investigators." These employees are normally selected from the ranks of retired railroad workers and their job is to attend the many union functions that are held, to meet with the men at the monthly union meetings to develop relationships within the railroad and union communities, and to make themselves known and available to railroad employees so that, if there is an occasion where there is an injured employee, the railroad community will point to the investigator, who is the point man for his lawyer.

FELA injury cases are referred by union officers, by former clients, and by co-workers, usually to the investigator, who then seeks to have the client sign a contract with his lawyer at a rate of 25%, which is considerably lower than the usual 33% or 40%, which is common in automobile accident and other trauma cases throughout the U.S. The reason for the low percentage is because of the intense competition and because of the fact that the cases are generally very economically rewarding to the plaintiff and to his counsel.

The distinction between an FELA specialist and any other lawyer in the U.S. who would seek to become known as a "railroad FELA Lawyer" is the ability of the professionals to attract clients who have been injured on the railroad through the fault of the railroad. Just wanting to have cases is not enough. There is a very difficult barrier for lawyers who are not "in the know," and that barrier can only be overcome by many, many years of exposure to the railroad industry, by trying the settling many cases, and by having a name in the community that has credence in the railroad community.

In this case, Bondurant has been practicing for 34 years, specializing for the most part in this field, having started with Willard Moody's firm in 1970, a firm that strictly specialized in FELA cases, and then striking out in his own firm in 1979, and to the present with total emphasis on FELA plaintiffs' work. As indicated above, Bondurant is a member of the Board of

Directors of ARLA and has been involved in many successful settled and tried cases over the years.

While the Court agrees that it is appropriate to consider Mr. Bondurant's expertise in the FELA field and how his expertise contributed to handling the cases, as noted above, the Court does not agree that the *quantum meruit* recovery should include a specific element for marketing efforts expended in the case. However, such efforts are ostensibly reflected in the contingent fee arrangements. One can only "market" as much as one can afford to "market." Without doubt, the Court considers the expertise, skill, and professional experience of Mr. Bondurant in determining the appropriate *quantum meruit* award in this case. However, no specific compensation is due just because someone "got the case."

## (g) The Character and Standing in Their Profession of the Attorneys

Throughout the trial of this matter, neither Mr. Bondurant nor Mr. Appleton seriously questioned the other's character and standing in the legal profession. Mr. Bondurant, as a member of the ARLA, is clearly well-respected and recognized in his field. Similarly, Mr. Bondurant hired Mr. Appleton and desired that he remain with the law firm, reflecting his confidence in Mr. Appleton's character and standing in the legal profession. It is most unfortunate that their professional relationship and apparent friendship came to this end. Nonetheless, the Court does not question the character or standing of Mr. Bondurant in his effort to recover for work performed on these cases before their departure.

## (h) Is Fee Absolute or Contingent

The fee was contingent in each case, though for many of the cases not as large a contingent fee as in most other fields of tort law, a fact noted above by Mr. Bondurant in his description of FELA cases.

## (i) The Result Secured by the Services of the Attorney

Mr. Bondurant's services clearly contributed to the overall result in the files that left and went with Mr. Appleton. As noted above, Mr. Bondurant evaluated each file when it arrived at the firm and then made recommendations regarding the appropriate method of handling the file

and conducting any additional investigation that might be necessary. The ultimate resolution of these cases has, and will, take place under the control of Mr. Appleton, which is a significant consideration for the Court because there is no fee without resolution. Nonetheless, Mr. Bondurant is entitled to have the Court consider the degree to which his services contributed to the overall result.

At the time of trial, Mr. Appleton testified that twenty-one of the twenty-six cases that left Bondurant and went to Appleton had settled. Counsel suggested that the Court might fashion a method of addressing all of these cases without the necessity of returning after the remaining cases are resolved. The Court has compared the amount of time Mr. Appleton and Mr. Bondurant have respectively estimated that they spent on these cases while at the Bondurant law firm. The estimates vary. For example, Mr. Appleton estimates that on twenty of these cases he worked 429.54 hours after the files left the Bondurant law firm, and 200.15 hours before he left the Bondurant law firm. A pure application of the Appleton percentage estimates resulting from such hours reflects that an average of 68% of the work on these twenty files was performed after they left the Bondurant law firm, and 32% was performed before they left. However, Mr. Bondurant began the process of estimating the amount of time worked on these files, and his estimates vary significantly, attributing 82% of the time to pre-departure work, and 18% to post-departure work. For example, while Mr. Appleton estimated that he spent 73 minutes working on the Allen matter before his departure, Mr. Bondurant estimated that nine employee hours were spent working on the case before the departure. The same thing applies to the other cases when the time estimates reflected in Plaintiff's Demonstrative Exhibit # 2 are compared with the estimate reflected in Defendant's Exhibit # 94. While it is true that Mr. Appleton, as an employee of the Bondurant law firm and at his own firm, is the one who performed most of the work on the files, he did so in consultation with Mr. Bondurant in some instances and in conjunction with other Bondurant law firm employees, and Mr. Appleton was reconstructing his time long after his departure. A review of Mr. Bondurant's description of the work performed on these cases, as described in his Method B Supplement, reflects a significant amount of work performed at the Bondurant law firm by attorneys, paralegals/secretaries/investigators. These descriptions reveal that many of these cases were taken on a one third contingent fee basis, while several were on a 40% basis. Having listened to the trial testimony and reviewed the documentary support for the positions of each party, the Court concludes that the figures provided

by both Mr. Bondurant and Mr. Appleton are rough estimates that, while somewhat helpful to the Court, are significantly limited in their ability to alone guide the Court's determination. Among other things, these varying estimates illustrate the degree to which the parties have differing perception of the events.

Having considered and discussed above all of the *Howard* factors and having specifically reviewed the evidence presented by each of the parties regarding their estimates of time devoted to each of the files in dispute, the Court concludes that Bondurant should receive 45% of each recovery on these cases that left the Bondurant law firm after Mr. Appleton's departure. Furthermore, the Bondurant law firm should be reimbursed for costs expended on each of these cases prior to their departure from the Bondurant law firm. This same formula should be applied to yet-to-be resolved cases on their resolution. As noted above, pre-departure costs are to be reimbursed to Bondurant as these cases are resolved.

## E. Bondurant's Breach of Fiduciary Duty and Tortious Interference Claims

Bondurant contends that Mr. Appleton breached a fiduciary duty he owed to the Bondurant law firm by soliciting, prior to his departure, employees and clients to depart the Bondurant law firm. At the trial of this matter and in the submissions of the parties, in support of his breach of fiduciary duty claim, Mr. Bondurant focused upon allegations that Mr. Appleton solicited *employees* of the firm to depart the firm and did so prior to his departure, rather than focusing on solicitation of clients. Mr. Appleton testified that he spoke with the Virginia State Bar regarding his client obligations and, consistent with their advice, he did not tell any of the law firm's clients that he was leaving before he did so, and he did not contact them unless they responded to his letter advising of his departure. As for the claim of employee solicitation, Mr. Appleton claims that it was Mr. Bondurant's actions that sowed seeds of discontent among the law firm's employees and that these employees did not have non-compete agreements with the law firm and were free to enter into discussions about departing with Mr. Appleton.

Bondurant also contends that Mr. Appleton tortiously interfered with Bondurant's business and business expectancy by filing erroneous and illegal attorney's liens in all of the cases he worked on and that remained at the Bondurant law firm. Mr. Appleton responds that his actions in

placing the liens on the files were based upon a good faith belief that he was entitled to compensation for work he performed on the cases.

Under "the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Technology Partners, L.L.C.*, 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003). "Subsumed within this general duty of loyalty is the more specific duty that the employee not compete with his employer during his employment." *Id.* "Nonetheless, in the absence of a contract restriction regarding this duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer after resigning his post." *Id.* However, the "employee's right in such circumstances is not absolute" and "this right, based on a policy of free competition, must be balanced with the importance of the integrity and fairness attaching to the relationship between employer and employee." *Id.* Accordingly, "under certain circumstances, the exercise of the right may constitute a breach of fiduciary duty" and "[w]hether specific conduct taken prior to resignation breaches a fiduciary duty requires a case by case analysis." *Id.*

The elements of a cause of action for tortious interference with a business relationship are as follows: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy, (3) a reasonable certainty that, absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy, and (4) damage to the plaintiff. *Id.* at 289, 576 S.E.2d at 757.

The dispositive question to be resolved regarding both these theories of liability is whether Mr. Appleton's conduct was sufficient to constitute a breach of his fiduciary duty of loyalty to Bondurant. *Id.* at 290, 576 S.E.2d at 757-58. However, "the courts must be mindful that the fact that particular conduct of an employee caused harm to his employer does not establish that the conduct breached any duty to the employer." *Id.* Furthermore, "[t]his is so because the law will not provide relief to every 'disgruntled player in the rough-and-tumble world comprising the competitive marketplace,' [] especially where, through more prudent business practices, the harm complained of could easily have been avoided." *Id.* Of course, the Virginia Supreme Court has recognized that certain conduct of an employee will clearly constitute a breach of this duty, including misappropriating trade secrets, misusing confidential information, or soliciting an employer's clients or other employees prior to termination of employment. *Id.* at 291, 576 S.E.2d at 758.

Mr. Appleton testified that, after February 9, 2004, and before his departure of February 20, 2004, he discussed the possibility of starting a new law firm with two of the Bondurant law firm's employees. Mr. Appleton testified that these discussions took place after office hours and away from the law firm's offices. Therefore, absent other evidence to the contrary, the Court finds that there was no breach of fiduciary duty based upon these discussions. Accordingly, there was insufficient evidence to support any breach of fiduciary duty claim by Bondurant. *See National Legal Research Group v. Lathan*, 1993 U.S. Dist. LEXIS 6681, *27 (W.D. Va. 1993) (unpublished disposition).

Mr. Appleton filed liens after his departure from the Bondurant law firm against those cases on which he had worked. While the Court addressed the propriety of these liens in the context of addressing pre-trial motions, that does not resolve the tortious interference claim. In addition to the Court's conclusion that the filing of such liens failed to constitute a breach of a fiduciary duty and therefore could not support a tortious interference claim, the Court also concludes that there was no proof of "intentional misconduct," as required in Virginia to support such a claim. *Williams*, 265 Va. at 289, 576 S.E.2d at 757. Mr. Appleton apparently believed, based upon his understanding of his oral agreement with Bondurant, that he was entitled to assert such liens. Because the evidence fails to establish tortious interference, Bondurant's claim must fail.

## F. Remedy

Based upon the findings of fact and conclusions of law above, the Court concludes that Appleton is entitled to be reimbursed for his $5,084.00 loan to the Bondurant law firm and orders such payment. Appleton is not entitled to any other relief based upon his breach of contract claim or his *quantum meruit* claim, and such claims are denied and dismissed. Bondurant is entitled to recover 45% of each recovery as to the cases that departed with Mr. Appleton and to receive reimbursement upon the resolution of a case for all costs expended on such cases, and the Court so orders. Bondurant is not entitled to any recovery on his breach of fiduciary duty claim or his tortious interference with business claim, and such claims are denied and dismissed. As each of the parties to this suit could have taken action to avoid the present dispute and each of the parties prevailed to some extent on their respective claims, the parties shall bear their own costs. *See Lawson & Frank, P.C.*, 66 Va. Cir. at 101. The post-trial briefs are ordered filed. The objections to this Opinion and

Order, as stated in the pleadings and briefs, and at oral argument on the record, are preserved and exceptions are noted on such basis. The Court therefore dispenses with the Va. Sup. Ct. R. 1:13 counsel endorsement requirement. It is so ordered.